# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOSHUA DONAHUE ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 16-13948** |
| **REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC ET AL.** | **SECTION: "H"** |

## ORDER AND REASONS

Before the Court are Defendant Makar Installations, Inc.'s ("Makar") Motion for Summary Judgment (Doc. 279) and Motion to Strike (Doc. 352). The Court heard Oral Argument on Makar's Motion for Summary Judgment on January 16, 2020. On January 17, 2020, the Court issued an Order granting Makar's Motion for Summary Judgment with reasons to follow.

For the following reasons, Defendant Makar's Motion for Summary Judgment is **GRANTED**, and the Motion to Strike is **DENIED**.

## BACKGROUND

This action arises out of injuries suffered by Plaintiff Joshua Donahue ("Donahue") while working in Defendant Republic National Distributing Company, LLC's ("Republic") warehouse. In 2015, Republic contracted with W&H Systems, Inc. ("W&H") for the construction of a new conveyer system at its liquor distribution warehouse. As part of this project, W&H contracted with Steele Solutions, Inc. ("Steele") to design and install a new mezzanine in the warehouse. Steele, in turn, subcontracted with Makar for the installation of

1

the Steele-designed mezzanine. W&H was responsible for installing the conveyer system that would run through the new mezzanine. W&H subcontracted with Defendant Darana Hybrid, Inc. ("Darana") to perform electrical work on the conveyer system. Darana had a contract with Defendant American ManPower Services, Inc. ("AMPS") whereby AMPS provided laborers to Darana to complete the electrical installation. Donahue was employed by AMPS for this project.

Makar began construction of the Steele-designed mezzanine on May 4, 2015 and completed the installation on May 15, 2015. The design called for the new mezzanine to be constructed approximately three feet higher than an older, pre-existing mezzanine and a few feet apart from it. The guardrails of the older mezzanine extended several inches higher than the floor of the new mezzanine. Above the mezzanines, however, was an unguarded and fixed overhead ceiling fan. The distance between the floor of the new mezzanine and the ceiling fan was less than seven feet. The exact location of the ceiling fan, in terms of whether and to what extent it hung over the new mezzanine, is in dispute.

Toward the end of Makar's installation job, its project supervisor, Antonio Torres ("Torres"), was struck in the head by the blades of the fan while he was standing on the new mezzanine. Torres testified that he was on his knees on the floor of the new mezzanine, picking up supplies and material, when he stood straight up. He was struck by the edge of the fan blades, knocking back his head and knocking off his hard hat. He was then struck again, directly in the head right along his hairline on his forehead. He was standing flat on the mezzanine's floor, not near the mezzanine's edges, when it happened. He did not realize that he was under a fan when he stood up and was struck. He was standing not under the fan's motor, but along the sides of

2

its blades. He recalls that the entirety of the fan was directly above the new mezzanine—not necessarily in the middle of the mezzanine, but not along its edges either. He also recalls that there was no fan over the old mezzanine. Torres testified that, at the time of his injury, the new mezzanine's perimeter had a yellow railing around it. There were no gaps in the railing for the soon-to-be-installed conveyer system to run through.

The fan was turned on every day that Makar was on the job site. Torres, who is approximately 5'9" and who was wearing 1" thick steel-toed boots when he was struck, had repeatedly asked Republic employees and representatives to turn the fan off, but it was never turned off. Neither Torres, nor any other Makar employee, knew where the fan switch was located. In fact, the first time that the fan was turned off was the day after Torres' injury, which was also the last day that Makar was on the job site. Torres testified that on that day, he told Republic representatives that "the damage had already been done," but that the fan should still be removed because it nevertheless posed a hazard.

On the day of his injury, Torres called Makar's owner, Gilbert Makaryk, and notified him of the incident. Makaryk spoke with W&H's project manager, David Sweitzer, about Torres' injury the same day.[1] Sweitzer then spoke with Steele about the injury within hours of it happening. He also spoke with Torres.

After Makar completed construction of the Mezzanine and departed Republic's warehouse, Donahue and other AMPS laborers began to work on the electrical installation for the conveyor system. Gaps had been made in the

---

[1] Doc. 330-2 at 73–76. Defendant Makar asserts in its brief that Makaryk also spoke directly with Steele Solutions about the fan and Torres' injury. Doc. 346 at 8. Makar cites to pages 35 and 36 of Makaryk's deposition testimony, but it failed to provide these pages to the Court. The Court was unable to locate the referenced deposition transcript pages anywhere else in the record.

yellow railing that encircled the new mezzanine's perimeter to allow access for the conveyer system. At the time of Donahue's injury, all but one of the gaps in the railing had been filled by the conveyor system. The remaining gap was located along the edge of the new mezzanine that was adjacent to the old mezzanine.

The new mezzanine had stairs at one end that led directly to the ground floor, but Donahue and other workers customarily descended to the ground floor by traversing from the new mezzanine to the old mezzanine. The old mezzanine also had stairs to the ground floor, and Donahue testified that it was more convenient to use the stairs of the old mezzanine because they were closer. The location of the single remaining gap in the new mezzanine's railing was the access point for traversing between the two mezzanines. Donahue testified that the two mezzanines were only six inches apart, but large enough for someone to fall between them.[2] He would place one foot on the floor of the new mezzanine, place his other foot on the top of the old mezzanine's rail, and then hop down about three to four feet to the ground of the old mezzanine. From there, he would take the stairs to the ground floor.

On July 29, 2015, Donahue had been on his knees on the floor of the new mezzanine installing a wire. He finished, stood up, and went toward the gap in the railing so he could descend to the ground floor by way of the old mezzanine. Donahue had one foot on the floor of the new mezzanine and began to move forward to place his other foot on top of the handrail of the older mezzanine when he was struck in the head by one of the fan blades. Donahue had worked at the site for approximately two months before his injury, and he

---

[2] Torres testified that the gap was three feet wide and that only a tall person would be able to make that jump.

testified that the fan was off the entire time he was there. This time, however, the overhead fan was turned on.

Donahue suffered numerous injuries and brought suit against Republic, W&H, Daranda, AMPS, Makar, and Steele, among others, for negligence. The Parties have since settled many claims. Remaining are Donahue's claims for negligence against Makar, Steele's crossclaim against Makar for contractual indemnity, and Steele's third-party demand against Cincinnati Insurance Company for reimbursement of litigation expenses.

## **LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[4] Nevertheless, a dispute about a material fact is "genuine" such that summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[5]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[6] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts

---

[3] FED. R. CIV. P. 56.
[4] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[5] *Id.* at 248.
[6] Coleman v. Hous. Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997).

5

showing the existence of a genuine issue for trial."[7] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[8]

"In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial."[9] The Court does "not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[10] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[11]

## LAW AND ANALYSIS

### I. Makar's Motion to Strike (Doc. 352)

At the outset, the Court notes that it previously granted Makar's Motion for Summary Judgment with reasons to follow.[12] At that time, the Court had not yet ruled on Makar's pending Motion to Strike. The Court has considered the relevant documents at issue in Makar's Motion to Strike[13] in rendering this Order and Reasons. Accordingly, the Motion to Strike is **DENIED**.

---

[7] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).
[8] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
[9] Johnson v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).
[10] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 393–94 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).
[11] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).
[12] Doc. 378.
[13] *See* Docs. 328-7, 328-8, 329-5, 330-8, 349-3.

## II. Makar's Motion for Summary Judgment (Doc. 279)

In its Motion for Summary Judgment, Makar argues that it is entitled to dismissal of all claims against it by Plaintiffs because it was not negligent and because it is relieved of any liability under LA. STAT. ANN. § 9:2771. In opposition, Plaintiffs argue that Makar literally created the hazardous condition that caused Donahue's injuries by installing the new mezzanine in close proximity to the unguarded overhead ceiling fan. Plaintiffs also argue that Makar failed to take reasonable steps to warn third parties or to physically guard against the hazardous condition despite having knowledge of the hazardous condition.

### A. Statutory Immunity Under LA. STAT. ANN. § 9:2771

At the outset, the Court notes that statutory immunity under LA. STAT. ANN. § 9:2771 is unavailable to Makar. This statute exculpates a contractor from liability

> for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration, or defect was due to any fault or insufficiency of the plans or specifications.[14]

However, this immunity does not extend to a contractor in third-party tort actions who has reason to believe that compliance with the specifications or plans would create a hazardous condition.[15] Here, there is no factual dispute that Makar had knowledge of the hazardous condition created by the proximity of the fan to the new mezzanine because, while installing the new mezzanine, one of Makar's employees was injured by the unguarded fan blades much in

---

[14] LA. STAT. ANN. § 9:2771.
[15] Harbor Const. Co., Inc. v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll., 69 So. 3d 498, 504 (La. App. 4 Cir. 2011) (citing Morgan v. Lafourche Recreation Dist. No. 5, 822 So. 2d 716, 721–22 (La. App. 1 Cir. 2002)).

7

the same manner that Donahue would come to be injured. Because of this knowledge, Makar is not immune from liability under LA. STAT. ANN. § 9:2771.

### B. Negligence Analysis

Having disposed of Makar's argument for statutory immunity, the Court now turns to the negligence analysis. Louisiana courts employ a duty-risk analysis for negligence.[16] This requires proof of five separate elements: (1) duty, (2) breach of duty, (3) cause-in-fact, (4) legal cause, and (5) damages.[17]

"The threshold issue in any negligence action is whether the defendant owed the plaintiff a duty, and whether a duty is owed is a question of law."[18] In general, a contractor owes third parties a duty to exercise ordinary care and refrain from creating hazardous conditions in the fulfillment of its contractual obligations.[19]

Plaintiffs furnished the Court with three expert opinions and one supplemental declaration to establish the particular duties owed by contractors and subcontractors. These opinions establish that "all subcontractors who perform work must ensure that the work area is safe."[20] Further, "[e]very contractor and subcontractor *on the jobsite* . . . share responsibility for the safety of the work site and all those who enter it."[21] Plaintiffs' experts also opined that "[t]o the extent that the designers and other related subcontractors should have reorganized the hazard, they had an obligation to do so."[22] Finally, "[a]ny time an employer has knowledge of a similar prior accident, the employer has a duty to protect *its employees* from

---

[16] Bufkin v. Felipe's La., LLC, 171 So. 3d 851, 855 (La. 2014).
[17] *Id.*
[18] *Id.* (citing Milvert v. Answering Bureau, Inc., 120 So. 3d 678, 687–88 (La. 2013)).
[19] Cormier v. Honiron Corp., 771 So. 2d 193, 197 (La. App. 3 Cir. 2000) (citing Oxley v. Sabine River Auth., 663 So. 2d 497, 504 (La. App. 3 Cir. 1995)).
[20] Doc. 279-6 at 1.
[21] *Id.* (emphasis added).
[22] *Id.* at 2.

8

exposure to the same hazard."[23] Even without a prior similar accident, Plaintiffs' experts noted, the "well-recognized" mechanical hazard of an exposed, rotating fan "within reach of persons in the area" creates a duty to "positively prevent[]" the fan from starting and operating.[24] "Ideally, such a fan would be entirely disconnected from its power source."[25] Notably, these expert opinions fail to articulate specific duties owed by Makar.

The undisputed facts demonstrate that: the mezzanine was designed by Steele;[26] Steele contracted with Makar solely for the purpose of erecting a mezzanine as one phase of a multi-phase project; Makar repeatedly asked Republic to turn off the fan while it was on the job site erecting the mezzanine; Republic did not take any action to turn off or remove the fan while Makar was on the job site despite repeated requests from Makar to do so; Makar's employees had no knowledge of where the control switch for the fan was, nor did they have any custody or control over the fan more generally; Republic turned the fan off the day after a Makar employee, Torres, was injured by it; Republic, W&H, and Steele were made aware of Torres' injury within hours of it happening; on the last day of the job, Torres told Republic to remove the fan entirely as it posed a hazard, even though the fan had been successfully turned off by that point; the fan remained turned off from Makar's last day until months later, when Donahue was injured; and after completing the Steele-designed mezzanine pursuant to the terms of its contract with Steele, Makar permanently left the job site.

---

[23] Doc. 279-8 at 2 (emphasis added).
[24] *Id.*
[25] *Id.*
[26] Plaintiffs attempt to argue that Makar had influence over the design of the new mezzanine by pointing to some email communications between representatives of Steele and Makar, but those emails demonstrate, at most, only that Makar inquired into the weight of an "i-beam" to be used in the structure. Doc. 285-2 at 3.

9

Plaintiffs assert that the generalized duties applicable to all contractors and subcontractors—to refrain from creating hazardous conditions and to ensure a safe workspace—required Makar to refuse to finish its work once it became aware of the fan's proximity to the mezzanine. Plaintiffs' own experts, however, fail to articulate such duty. Nor do Plaintiffs provide the Court with any legal authority for charging Makar with such a heightened duty.

In briefing and at oral argument, Plaintiffs also assert that Makar should have remained on the job site indefinitely, after its work was completed, in order to monitor the employees of other businesses as part of its duty to protect third parties. Again, Plaintiffs' experts do not articulate such a duty. In fact, one of Plaintiffs' experts says the opposite: "[e]very contractor and subcontractor *on the jobsite* . . . share responsibility for the safety of the work site and all those who enter it."[27] Thus, not only is the expert's opinion silent as to any purported duty to *remain* on a jobsite to ensure continued safe conditions, but it limits responsibility for work site safety to contractors *on the jobsite*. Taking Plaintiffs' argument to its logical conclusion, it becomes readily apparent that such a duty would be unworkable. Contractors would remain on jobsites indefinitely, slowing down construction projects and driving up the costs of construction.

Finally, Plaintiffs argue that Makar breached a duty in failing to physically guard against the fan's hazardous condition by putting up safety tape or marking the area with cones. Plaintiffs fail to provide this Court with any law or expert opinion that requires such actions for Makar to discharge its duties to third persons. In terms of guarding against the fan, Plaintiffs' experts opine that the fan should have been disconnected from its power source[28] or

---

[27] Doc. 279-6 at 1 (emphasis added).
[28] Doc. 279-8 at 2.

subject to a "Lock Out Tag Out" procedure.[29] The evidence presented to the Court demonstrates that Makar had no control over the fan or any knowledge of how to turn it off. Any duty to disconnect the fan from its power source or to enact a "Lock Out Tag Out" procedure was outside the scope of Makar's authority or ability. That someone later turned the fan on months after Makar had left the job site can hardly be attributed to Makar's lack of putting up caution tapes or cones.

This is not a case where the duty owed is so obvious that expert opinions articulating duties are unnecessary. Plaintiffs' experts fail to articulate any actionable duty that Makar did not discharge, and the Court cannot find one in the law.[30] If anything, the evidence speaks to how Makar effectively discharged its duty: its warnings and repeated admonitions resulted in the fan remaining off from the day after Torres' injury to the day of Donahue's injury. Thus, the Court finds that Makar did not breach a duty owed to Donahue.

## CONCLUSION

For the foregoing reasons, Makar's Motion to Strike is **DENIED**. Makar's Motion for Summary Judgment is **GRANTED**, and it is hereby **DISMISSED WITH PREJUDICE**.

---

[29] Doc. 279-7 at 2.

[30] In Lafont v. Chevron, a Louisiana court found that the duty owed by a contractor to another contractor's employee while each contractor was on the same site performing work was "at most the duty to refrain from creating an unreasonable risk of harm or a hazardous condition." Lafont v. Chevron, U.S.A., Inc., 593 So. 2d 416, 420 (La. Ct. App. 1991). The *Lafont* plaintiff was injured while performing volunteer work for another contractor when he had some downtime. Despite performing work *for* the other contractor, the court refused to impute additional duties to the non-employer contractor that would otherwise be owed to an employee, such as a duty to train or supervise. Here, the relationship between Donahue and Makar is even further removed; Makar was never on the site at the same time as Donahue, nor did Donahue ever perform work of any kind for Makar.

11

New Orleans, Louisiana this 27th day of January, 2020.

_____
**JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE**