UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


JOSHUA DONAHUE ET AL.                    CIVIL ACTION


VERSUS                                   NO: 16-13948


REPUBLIC NATIONAL DISTRIBUTING           SECTION: "H"
COMPANY, LLC ET AL.


## ORDER AND REASONS

Before the Court is Cross Defendant Makar Installations, Inc. ("Makar")
and Third-Party Defendant Cincinnati Insurance Company's ("CIC") Motion
for Summary Judgment (Doc. 394). For the following reasons, Makar and CIC's
Motion for Summary Judgment is **DENIED IN PART and GRANTED IN
PART.**


## BACKGROUND

This action arises out of injuries suffered by Plaintiff Joshua Donahue
("Donahue") while working in Defendant Republic National Distributing
Company, LLC's ("Republic") warehouse. In 2015, Republic contracted with
W&H Systems, Inc. ("W&H") for the construction of a new conveyer system at
its liquor distribution warehouse. As part of this project, W&H contracted with
Steele Solutions, Inc. ("Steele") to design and install a new mezzanine in the
warehouse. Steele, in turn, subcontracted with Makar for the installation of
the Steele-designed mezzanine. W&H was responsible for installing the
conveyer system that would run through the new mezzanine. W&H

1

subcontracted with Defendant Darana Hybrid, Inc. ("Darana") to perform electrical work on the conveyer system. Darana had a contract with Defendant American ManPower Services, Inc. ("AMPS") whereby AMPS provided laborers to Darana to complete the electrical installation. Donahue was employed by AMPS for this project.

Makar began construction of the Steele-designed mezzanine on May 4, 2015 and completed the installation on May 15, 2015. After Makar completed construction of the Mezzanine and departed Republic's warehouse, Donahue, an employee of American ManPower Services, Inc. ("AMPS"), began working on the electrical installation for the conveyor system. On July 29, 2015, Donahue was struck in the head by a rotating fan that hung above the old and new mezzanines. Donahue and his wife, Angela Bolton, ("Plaintiffs"), brought suit against Republic and the many contractors and subcontractors on the project.

On August 21, 2018, Plaintiffs filed their Fourth Supplemental and Amended Complaint, which included multiple counts of negligence against Steele, Makar, and five additional defendants for flaws in the design, construction, and installation of the mezzanine and for failure to guard against the fan's hazardous condition. In Steele's Answer to Plaintiff's Fourth Supplemental and Amended Complaint, Steele included a crossclaim against Makar, alleging that the parties' subcontract obligated Makar to defend and indemnify Steele against liability arising out of incidents at the Republic warehouse.[1] Steele also asserted a third-party complaint against CIC, demanding defense and indemnity as an additional insured in accordance with the Makar-Steele subcontract.[2]

---

[1] Doc. 210 at 17.
[2] Doc. 210 at 19–21.

2

On January 17, 2020, Steele entered into a settlement with Plaintiffs, and Plaintiffs claims against it were dismissed.[3] Later that same day, after finding that Makar did not have a duty to prevent against Donahue's injury, this Court entered an Order granting Makar's Motion for Summary Judgment and dismissing Makar with prejudice.[4] Now that both Steele and Makar are dismissed from Plaintiffs' original suit, Makar and CIC move for summary judgment and ask that this Court to find that Makar and CIC have no contractual obligation to defend and indemnify Steele, to dismiss Steele's claims against them with prejudice, and to award costs in favor of Makar and CIC.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[6] Nevertheless, a dispute about a material fact is "genuine" such that summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[7]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[8] "If the moving party meets the initial

---

[3] *See* Docs. 377, 379.

[4] The Court entered its Order dismissing Makar on January 17, 2020. *See* Doc. 378. The Court subsequently issued its reasons for judgment on January 27, 2020. *See* Doc. 382.

[5] FED. R. CIV. P. 56.

[6] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[7] *Id*. at 248.

[8] Coleman v. Hous. Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997).

burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[9] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[10]

"In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial."[11] The Court does "not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[12] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[13]

## LAW AND ANALYSIS

Before determining what obligations Makar and CIC have to Steele under the CIC insurance policy and the Steele-Makar subcontracts, the Court must determine what law applies. In diversity cases, federal courts are bound by the conflict-of-law rules of the state in which they are sitting.[14] Accordingly, a federal district court sitting in Louisiana is bound to apply Louisiana choice-

---

[9]  Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).
[10] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
[11] Johnson v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).
[12] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 393–94 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).
[13] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).
[14] Kozan v. Comstock, 270 F.2d 839 (5th Cir. 1959).

of-law rules.[15]   Louisiana Civil Code article 3537 specifically addresses which law applies to issues of conventional obligations. Article 3537 states:

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue. That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

Steele argues that Wisconsin law should govern as Steele is a Wisconsin corporation and Wisconsin would receive the benefit of an indemnity agreement in Steele's favor. Makar and CIC contend that Louisiana law governs but also argue that Illinois law, not Wisconsin law, would be the next best alternative. As neither party fully briefed the choice-of-law issue, and as the facts surrounding the formation of the subcontracts are deeply contested, an in-depth choice-of-law analysis at this stage is improper.

This Court can, however, still address Makar and CIC's arguments that do not require a conflict of laws analysis.[16] This Court will therefore address the applicability of the Steele-Makar subcontracts and the effect of Steele's late production of the 2008 subcontract. Further, as the laws of Illinois, Wisconsin,

---

[15] Crase v. Astroworld, Inc., 941 F.2d 265 (5th Cir. 1991).

[16] See R.R. Mgmt. Co. v. CFS Louisiana Midstream Co., 428 F.3d 214, 222 (5th Cir. 2005) ("Where there are no differences between the relevant substantive laws of the respective states, there is no conflict, and a court need not undertake a choice of law analysis.").

and Louisiana do not conflict on the issues of general contractual interpretation and an insurer's duty to defend and indemnify,[17] and because the parties agree that Louisiana law should govern interpretation of the insurance contract, this Court will also define CIC's obligations to Steele under the CIC policy.

### A. Validity of the Subcontract Agreements

The Parties dispute the relevance of two documents, both of which are titled "Subcontract Terms and Conditions" and purport to delineate the obligations of both Steele and Makar as contractor and subcontractor.

### 1. *The 2016 Subcontract*

Makar and CIC first request that this Court find that an unsigned Subcontract Terms and Conditions, dated January 1, 2016, fails to "provide a contractual duty in the movants to defend and indemnify Steele for its own negligence."[18] Steele does not dispute that the unsigned, post-dated contract fails to govern the parties' obligations in the current matter. Steele explains that it initially had trouble locating the proper subcontract and only produced the 2016 subcontract to evidence the contents of the missing document.[19] Having since identified the proper subcontract, Steele does not contest that the 2016 document is now irrelevant. This Court therefore has no trouble finding the 2016 Subcontract Terms and Conditions inapplicable to the current issue.

---

[17] *See* Water Well Sols. Serv. Grp., Inc. v. Consol. Ins. Co., 2016 WI 54, 369 Wis. 2d 607, 881 N.W.2d 285 (explaining Wisconsin law governing insurance policy interpretation and the duty to defend); *see* Illinois State Bar Ass'n Mut. Ins. Co. v. Canulli, 2020 IL App (1st) 190142, ¶ 21, 150 N.E.3d 140, 145, *reh'g denied* (May 13, 2020) (explaining Illinois law governing insurance policy interpretation and the duty to defend).

[18] Doc. 394-1 at 1.

[19] *See* Doc. 406 at 5.

### 2. *The 2008 Subcontract*

The second agreement, and the agreement that will control this Court's

analysis, is a "Subcontract Terms and Conditions" dated August 14, 2008, and

signed by Michael Thelen, President of Steele Solutions, and Gil Makaryk, Vice

President of Makar (hereinafter "the Subcontract"). In relevant part, the

Subcontract requires the subcontractor to indemnify, defend, and hold

harmless Steele Solutions from:

    (i)    All claims, damages, losses, and expenses including, but not limited to, attorneys' fees, arising out of or resulting from Subcontractor's performance of its work under this Agreement and each Schedule of Work by, Subcontractor, its sub-subcontractors and suppliers, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.

    (ii)    All claims, damages, losses and expenses including, but not limited to, fines, penalties and attorneys' fees, arising out of or resulting from Subcontractor's failure to comply with any applicable laws, ordinances, rules, regulations or orders in connection with each Schedule of Work including, without limitation, the Occupational Safety and Health Act of 1970.[20]

The Subcontract Terms and Conditions also obligates the subcontractor to

obtain insurance, including:

    b) General Liability. Comprehensive general liability insurance providing limits for bodily injury with personal injury, including coverage for its employees, of $1,000,000.00 for each occurrence and $2,000,000.00 in the aggregate; and property damage coverage of $1,000,000.00 for each occurrence and $2,000,000.00 in the aggregate. *The policy must include Steele Solutions*, the owner of the Project and others, if requested by Steele Solutions, *as additional insureds* and must provide premises-operations, elevators, independent contractors, and broad form property damage, contractual liability, products and completed operations

---

[20] Doc. 394-5 at 4.

> coverages (which shall be maintained in force for a period of two years after substantial completion of the project for such longer period of time as is described in the General Contract). In addition, Subcontractor shall maintain an umbrella liability policy in the amount of $5,000,000.00 providing the same coverages and with the same additional insureds as the basic policy.[21]

As evidence that the Subcontract governs the current matter, Steele looks to a document titled "Schedule of Work" that outlines Makar's work for Steele at the Republic facility from May 4, 2015 to May 15, 2015.[22] Critically, the Schedule of Work states:

> Subject to the terms and conditions as provided herein and in the Subcontract Terms and Conditions (the 'Agreement') between Steele Solutions, Inc. ('Contractor') and Makar Installations, Inc. ('Subcontractor'), Subcontractor agrees to furnish the labor, material, skill and equipment in accordance with the terms and conditions of the Agreement and this Schedule of Work.[23]

Steele argues that "the Agreement" referenced in the Schedule of Work refers to the Subcontract. As such, Steele argues that Makar agreed to defend and indemnify Steele for liability arising out of Donahue's injury and to list Steele as an additional insured on its policy with CIC.

Although the parties spend a significant portion of their briefings contesting the authenticity of the Subcontract, the issue of the Subcontract's validity is preserved for trial. Makar and CIC preface their discussion of the Subcontract by conceding that "serious questions of fact exist" surrounding the authenticity and applicability of the Subcontract.[24] Acknowledging that the issue of the Subcontract's validity is inappropriate for summary judgment, Makar and CIC assume the "authenticity, admissibility and legal effect of the

---

[21] *Id.* at 5 (emphasis added).
[22] *See* Doc. 394-8.
[23] *Id.*
[24] Doc. 394-1 at 5 n.27.

8

2008 document" for the limited purpose of their Motion for Summary Judgment.[25] This Court therefore declines to rule on the issue at this time and will assume that the Subcontract controls the rights of the parties for the purposes of Makar and CIC's Motion for Summary Judgment.

## B. The Timing of the Subcontract's Production

Although Makar and CIC stipulate to the authenticity and admissibility of the Subcontract for the purposes of this Motion, they simultaneously argue that this Court should not look to the Subcontract in evaluating the rights of the parties. Makar and CIC contend that Steele is bound by the 30(b)(6) corporate deposition testimony of Steele's representative, David Douglas, who testified that he did not know of the whereabouts of the Subcontract and had conducted an exhaustive search for its location.[26] Makar and CIC thus argue that Steele's production of the Subcontract after the deposition of David Douglas constitutes "sandbagging"[27] and that this Court should consequently ignore the Subcontract. Makar and CIC further argue that Steele's submission of the affidavit of its CEO, Michael Thelen, who asserts the validity of the Subcontract, is improper as it contradicts Douglas's deposition.[28] This Court disagrees.

Neither Steele's production of the Subcontract nor Michael Thelen's affidavit contradict David Douglas's testimony. Douglas testified that he believed the Subcontract existed as he had seen the contract before, but that

---

[25] *Id*. at 5.

[26] *See* Doc. 402-1.

[27] Sandbagging refers to the practice of "deliberately avoid[ing] making the proper objection or request" to later claim post-trial error. United States v. Sisto, 534 F.2d 616, 624 n.9 (5th Cir. 1976).

[28] *See* Doc. 396-2.

he was unable to locate it at the time of the deposition.[29] In fact, when Makar's counsel asked Douglas whether Steele had produced everything in its possession relating to the Republic project, Steele's counsel interjected and asserted that more documents were expected.[30] As Douglas consistently testified that the Subcontract existed, this Court fails to find Douglas's testimony inconsistent with either the Subcontract's production or Michael Thelen's affidavit.

Further, this Court does not find that Steele's production of the Subcontract constitutes "sandbagging." Makar looks to *QBE Insurance Corporation v. Jorda Enterprises, Inc.*, for the proposition that "a corporation is bound at trial by a lack of knowledge response at a 30(b)(6) deposition."[31]  In *QBE*, the court precluded the corporation from testifying on certain subjects at trial,

> Because the discovery deadline ha[d] expired, because QBE did not fulfill its obligation to properly prepare its own designee, because QBE waited until the corporate representative deposition began to give notice of its designee's partial inadequacy and because its designee could have (but did not) review substantially more material in order to be a more-responsive witness.

Unlike in *QBE*, Steele produced the Subcontract less than twenty-four hours after the corporate deposition, the production happened well before the discovery deadline, there is no evidence that Steele's corporate designee purposefully failed to produce the contract at the deposition, and neither Makar nor CIC have demonstrated prejudice from the late production. This Court therefore fails to see why Steele should be estopped from relying on the

---

[29] *See* Doc. 402-1.
[30] *See id* at 5.
[31] 277 F.R.D. 676, 681 (S.D. Fla. 2012).

Subcontract.[32]

## C. CIC's Duty to Defend and Indemnify

Steele argues that the Subcontract and Schedule of Work obligated Makar to name Steele as an additional insured on its policy with CIC. As evidence that it was so named, Steele points to a Certificate of Liability Insurance, dated August 8, 2014, that lists Makar as an insured and Steele as an additional insured with CIC.[33] Although CIC disputes that the Certificate of Liability evidences actual coverage, Steele and Makar both agree that if Steele is an additional insured, Steele's coverage is controlled by the "Automatic Additional Insured" endorsement to the August 8, 2014 to August 8, 2015 CIC policy ("Additional Insured Endorsement").[34]

The Additional Insured Endorsement defines an additional insured as including those who the insured is "required to add as an additional insured on this Coverage Part under: (1) A written contract or agreement . . . but only with respect to liability arising out of 'your work' performed for that additional insured by you or on your behalf."[35]  The endorsement further limits coverage to the limits "specified in the written agreement or in the Declarations of this Coverage Part, whichever are less."[36]

CIC first contends that Steele is not an additional insured under CIC's policy because Steele failed to produce proof of the required "written agreement" at the time it made its third-party demand. CIC also argues that,

---

[32] The Court also reminds CIC and Makar that they have already admitted that the issue of "whether Steele should be estopped from relying on the Subcontract" is a genuine issue of material fact. Doc. 394-1 at 5 n.27.
[33] *See* Doc. 394-9.
[34] *See* Doc. 394-4.
[35] *See id*. at 65.
[36] *Id*. at 66.

even if Steele is an additional insured, the policy exclusions and Makar's dismissal from the lawsuit preclude coverage for Plaintiffs' claims against Steele.

### 1. *Steele's Status as an Additional Insured*

Under Louisiana law, "[a]n insurance policy is a conventional obligation that constitutes the law between the insured and insurer, and the agreement governs the nature of their relationship."[37] Insurance policies, therefore, "should be construed . . . using the general rules for the interpretation of contracts" under Louisiana law.[38] "The role of the judiciary in interpreting insurance contracts is to ascertain the common intent of the parties to the contract."[39] "When the words of an insurance contract are clear and explicit and lead to no absurd consequences, courts must enforce the contract as written and may make no further interpretation in search of the parties' intent."[40]

Here, the CIC policy is clear and leads to no absurd consequences. The CIC policy defines an additional insured as including those who Makar is required to add as an additional insured under a written contract or agreement. The Subcontract, a written agreement, clearly obligates Makar to include Steele as an additional insured on its Comprehensive General Liability policy. This Court therefore has no difficulty finding that Steele is an additional insured on the CIC policy.

CIC argues, however, that Steele is not an additional insured because the "written contract" upon which Steele's additional insured status is premised was not produced at the time Steele tendered its defense to CIC. CIC

---

[37] Peterson v. Schimek, 729 So. 2d 1024, 1028 (La. 1999) (citing LA. CIV. CODE art. 1983).
[38] Carbon v. Allstate Ins. Co., 719 So. 2d 437, 439 (La. 1998).
[39] *Id*. (citing LA. CIV. CODE art. 2045).
[40] *Peterson*, 729 So. 2d at 1028.

contends that because Steele was unable to locate the Subcontract when Steele filed its third-party demand, and because Makar has "consistently denied that there was a written, signed, contract, and had none among its records," CIC "had no basis to conclude that Steele was an additional insured."[41] CIC therefore argues that Steele's claim for defense and indemnity was legally insufficient "at the time of tender" and cannot be retroactively revived.[42] This Court disagrees.

First, it is important to note that CIC cites no law in support of this proposition, and this Court is not aware of any.[43] The duty to defend is not dependent on the insured's proof of coverage at the outset of litigation. Rather, as discussed more fully below, the duty to defend is triggered when the plaintiff's complaint shows the possibility of coverage, even if the alleged insured is later proven to be an uncovered party.[44]

A poignant example of this principal is illustrated in *Vaughn v. Franklin*.[45] In *Vaughn*, the insurer argued that it had no duty to defend two parties who would only qualify as additional insureds if they had contracted with the policyholder to have their fields sprayed with fertilizer.[46] Throughout the litigation, the alleged insureds held the position that they had never made

---

[41] Doc. 394 at 9.

[42] *See* Doc. 402 at 6–7.

[43] CIC's repeated emphasis of the phrase "at the time of the tender of defense" leads this court to believe that CIC is referring to Louisiana case law concerning waiver. In Louisiana, an insurer can deny coverage on the basis that it did not receive timely notice of an occurrence or potential claims if it proves it can show actual prejudice. *See* Peavey Co. v. M/V ANPA, 971 F.2d 1168, 1172 (5th Cir. 1992); *see also* Anco Insulations, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 787 F.3d 276, 283 (5th Cir. 2015) (finding that the insured breached the duty to "tender claims timely" when timely notice of suit was an express condition precedent to coverage). Here, however, Steele gave timely notice to CIC of the pending lawsuit by way of a third-party demand.

[44] Vaughn v. Franklin, 785 So. 2d 79, 84–85 (La. App. 1 Cir. 2001), *writ denied*, 798 So. 2d 969 (La. 2001).

[45] *Id.*

[46] *Id.* at 85.

13

such a contract with the policyholder.[47] The Louisiana First Circuit Court of Appeal held nonetheless that the insurer was arbitrary in its breach of the duty to defend.[48] In so holding, the court found, in part, that "[t]he fallacy of St. Paul's entire argument, however, is that the *duty to defend arose when it had knowledge* that (1) it issued a policy of insurance that covered property growers who contracted with the named insured and (2) the [alleged insured] had been sued" on that basis.[49] *Vaughn* clearly refutes CIC's position that evidence of non-coverage at the outset of litigation disqualifies a party as an additional insured.[50]

Although the facts available to CIC prior to the Subcontract's production may evidence CIC's reasonableness in the event that Steele seeks penalties for CIC's failure to timely tender defense,[51] they do not affect the validity of CIC's obligation. Again, this Court denounces the notion that a temporarily misplaced contract completely relieves the insurer of its contractual responsibility.

## 2. *The Policy Exclusions*

Steele opposes CIC's reliance on certain policy exclusions to limit CIC's duty to defend and indemnify Steele. Specifically, CIC relies on the provisions excluding bodily injury arising out of the:

> (1) Rendering of, or failure to render, any professional architectural, engineering or surveying services, including:

---

[47] *Id.* at 85–86.

[48] *Id.*

[49] *Id.* at 87.

[50] *See also* Am. Home Assur. Co. v. Czarniecki, 230 So. 2d 253 (1969) (finding that the insurer had a duty to defend the driver even though the court ultimately found that driver was not a covered party).

[51] The trial court can award penalties and attorney's fees if it finds that the insurer was arbitrary and capricious in its breach of the duty to defend. *See e.g.*, Cunard Line Co. v. Datrex, Inc., 26 So. 3d. 886, 895 (La. App. 3 Cir. 2009), *writ denied*, 29 So. 3d 1264 (La. 2010).

> (a) The preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
> (b) Supervisory, inspection, architectural or engineering activities;
> (2) Sole negligence or willful misconduct of, or for defects in design furnished by the additional insured or its employees.[52]

Steele does not dispute the applicability of the policy exclusions but rather argues that the policy exclusions constitute an affirmative defense that CIC waived when it failed to include them in its Answer.

Federal Rule of Civil Procedure 8(c) "requires defendants to plead affirmative defenses with enough specificity or factual particularity to give the plaintiff fair notice of the defense that is being advanced."[53] Courts sitting in diversity must look to substantive state law to determine what constitutes an affirmative defense.[54] With only minor exceptions, Louisiana law defines a policy exclusion as an affirmative defense that must be specifically plead or waived.[55] However, failure to plead an affirmative defense under Rule 8(c), unlike under Louisiana law, does not automatically result in waiver.[56] Rather, Rule 8(c) allows the federal trial court discretion "to determine whether the party against whom the unpleaded affirmative defense has been raised has suffered prejudice or unfair surprise."[57]

Although the Court finds that CIC did indeed fail to properly assert the exclusions as an affirmative defense in its Answer to Steele's Third-Party Demand, the Court also finds that Steele was not unfairly prejudiced by CIC's failure to do so. In CIC's Answer, CIC adopted "all answers and defenses

---

[52] *Id*.
[53] Aunt Sally's Praline Shop, Inc. v. United Fire & Cas. Co., 418 F. App'x 327, 330 (5th Cir. 2011).
[54] *Id*; LSREF2 Baron, L.L.C. v. Tauch, 751 F.3d 394, 398 (5th Cir. 2014).
[55] *Aunt Sally's Praline Shop, Inc.*, 418 F. App'x at 330.
[56] *Id*.
[57] *Id*.

contained in Makar Installations, Inc.'s Answer to Plaintiff's Fourth Supplemental and Amended Complaint as if set forth herein in extenso."[58] In Makar's Answer, Makar's Fifteenth Defense stated: "Pursuant to Makar's subcontract with Steel[e] Solutions, Inc., Steele Solutions provided all design, plans and materials for construction of the portion of the mezzanine constructed by Makar and therefore any alleged defect in design or materials lies solely with Steele Solutions, Inc."[59] Steele does not contest that it was responsible for the design of the platform, and Steele litigated the extent to which the design of the platform contributed to Donahue's injuries at oral argument and in its briefings.[60] Steele therefore cannot claim prejudice or surprise when CIC alleges that Steele's activities at the Republic facility fall within policy exclusions for engineering and design.

Unlike the cases where the Fifth Circuit has found prejudice, CIC is not asserting the application of the policy exclusions for the first time at, or near, trial.[61] Rather, like in *Williams v. Allstate Indemnity Company*, CIC asserted its reliance on the policy exclusions in a motion for summary judgment where Steele had two opportunities to refute CIC's arguments.[62] Further, as the additional insured endorsement is only two pages long and is clearly the portion of the policy that controls the scope of Steele's coverage, it "could not be hidden away only to be pulled out later in a surprising or prejudicial

---

[58] *See* Doc. 231 at 2 (emphasis omitted).

[59] Doc. 216 at 9.

[60] *See* Doc. 324, 372.

[61] *See, e.g.*, *Aunt Sally's Praline Shop, Inc.*. 418 F. App'x at 330–31.

[62] *See* Williams v. Allstate Indem. Co., No. CIV.A. 07-6796, 2009 WL 723526, at *4 (E.D. La. Mar. 19, 2009) ("[A]n affirmative defense is not waived if the plaintiff was not prejudiced in its ability to respond. It is notable that in the more than a month since this motion was filed, the plaintiff has wholly failed to attack the validity of the exclusion in either of its two responsive pleadings.") (internal citations and quotations excluded).

manner."[63] This Court therefore finds that CIC did not waive its right to assert the policy exclusions as limiting its duty to defend and indemnify Steele.

    3. *CIC's Duty to Defend*

    An insurer's duty to defend its insured is broader than its duty to provide coverage.[64] Whether an insurer has a duty to defend is determined by application of the "eight corners rule," whereby the court compares the four corners of plaintiff's most recently amended complaint to the four corners of the insurance policy.[65] If a liberal reading of the plaintiff's allegations do not unambiguously exclude the possibility of coverage under the insurance policy, then the insured has a duty to defend.[66] Thus, even if several of the plaintiff's claims are excluded from coverage under the policy, the duty to defend persists so long as there is at least one claim that is not unambiguously excluded.[67]

    Looking first to the Additional Insured Endorsement, the CIC policy the policy limits additional insured coverage to "liability arising out of '[Makar's] work' performed for [Steele] by [Makar] or on [Makar's] behalf."[68] The endorsement also contains the policy exclusions for engineering and design services, as more fully explained above. In Plaintiffs' Fourth Supplemental and Amended Complaint, Plaintiffs allege that Steele and Makar, along with five other defendants, are jointly liable for seventeen counts of negligence.[69] Of these seventeen counts, only one count possibly falls within the policy

---

[63] Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co., 706 F.3d 622, 633 (5th Cir. 2013).
[64] Suire v. Lafayette City-Parish Consol. Gov., 907 So.2d 37, 51 (La. 2005).
[65] Maldonado v. Kiewit Louisiana Co., 146 So. 3d 210, 218–19 (La. App. 1 Cir. 2014).
[66] *Id*.
[67] *Id*.
[68] *See* Doc. 394-4 at 65.
[69] Doc. 203 at 11.

exclusions.[70] Additionally, as the complaint holds Makar and Steele jointly liable for all counts of negligence, the complaint does not exclude the possibility that Steele could be held liable for Makar's work. As there are sixteen counts of negligence against Steele that are not unambiguously excluded from the policy, it is clear that CIC had a duty to defend Steele at the time Plaintiffs filed their Fourth Supplemental and Amended Complaint.[71]

The duty to defend continues until "an event occurs which shows that coverage is unambiguously excluded."[72] The Additional Insured Endorsement specifically limits coverage to liability arising out Makar's work. When this Court granted Makar's Motion for Summary Judgment and dismissed Makar with prejudice, it became clear that any liability owing to Steele could not arise, in whole or in part, out of Makar's work.[73] "In the absence of an express and unequivocal statement that a party is to be indemnified for that party's own negligence, the contract of indemnification will not be construed to create such an obligation."[74] To read the insurance policy as continuing to cover Steele after Makar's dismissal would be to read the policy as indemnifying Steele for its own negligence.[75] As the Additional Insured Endorsement explicitly excludes coverage for claims arising from Steele's "sole negligence," such a finding is

---

[70] *See* Doc. 203 at 11 ("i) Designing, constructing, and/or installing scaffolding and/or a mezzanine level that cause workers such as Donahue to come in dangerous proximity to the rotating blades of an unguarded fixed overhead industrial fan").

[71] *See* Mossy Motors v. Cameras America, 898 So. 2d 602, 607 (La. App. 4 Cir. 2005) ("The duty to defend arises whenever the pleadings against the insured disclose even a possibility of liability under the policy.").

[72] *Maldonado*, 146 So.3d at 221.

[73] *See id; see also* Moore v. Home Depot USA, Inc., 352 F. Supp. 3d 640, 648 (M.D. La. 2018) (interpreting a similar policy provision as allowing for additional insured coverage as long as the liability is caused at least in part by the insured party).

[74] Boykin v. PPG Indus., Inc., 987 So. 2d 838, 843 (La. App. 3 Cir. 2008).

[75] *See* Williams v. Univ. of Louisiana Lafayette, 297 So. 3d 1045, 1051 (La. App. 3 Cir. 2020) (finding that summary judgment in favor of the named insured negated the additional insured's possibility of coverage).

clearly contrary to the plain language of the contract. Further, Makar's dismissal makes it clear that any liability Steele would have borne at trial would have arisen out of Steele's design of the mezzanine and would thus fall squarely within the policy exclusions.[76] It was on January 17, 2020, therefore, when this Court dismissed Makar, that Steele's coverage under the policy was unambiguously excluded, and CIC's duty to defend Steele was terminated.

   *4. CIC's Duty to Indemnify*

   Under Louisiana law, an indemnitee "must show actual liability to recover."[77] When the claim is based on a written contract, like an insurance policy, the indemnitee need only show potential liability.[78] For Steele to be reimbursed for the settlement amount with Plaintiffs, Steele would have to prove that it would have been potentially liable for acts covered by the policy.[79] As discussed above, Makar's dismissal precluded the possibility of Steele's coverage under the policy. "When uncontroverted facts preclude the possibility of a duty to indemnify, the duty to defend ceases and the duty to indemnify is negated."[80] This Court therefore finds that CIC has no duty to indemnify Steele for the settlement expenses paid to Plaintiffs.


**D. Makar's Duty to Defend and Indemnify**

   Louisiana law and Wisconsin law differ in their treatment of indemnity agreements. Louisiana law treats indemnity agreements as a "specialized form

---

[76]*See* Doc. 382 ("The undisputed facts demonstrate that: the mezzanine was designed by Steele."); *see also* Doc. 198 at 16 (asserting that Steele was never at the Republic warehouse before, during, or after Makar installed the mezzanine).

[77] Chevron Oronite Co., L.L.C. v. Jacobs Field Servs. N. Am., Inc., 951 F.3d 219, 226 (5th Cir. 2020) (internal quotations omitted).

[78] *Id*. (quoting *Vaughn*, 785 So. 2d at 87).

[79] *See Vaughn*, 784 So. 2d at 88.

[80] *Maldonado*, 146 So. 3d at 219.

of contract which is distinguishable from a liability policy."[81] In Louisiana, therefore, an indemnitor's duty to defend and indemnify does not arise until the indemnitee sustains loss.[82] To the contrary, Wisconsin law treats an indemnitor's duty to defend similarly to that of an insurer, where the indemnitor's duty to defend arises upon the indemnitee's "'tender of a claim against it for acts or omissions that were arguably within the purview of the [agreement].'"[83] As there is a material conflict as to the law that should govern Makar's obligations under the indemnity agreement, the Court declines to rule on the issue at this time.

## <u>CONCLUSION</u>

For the foregoing reasons, Makar and CIC's Motion for Summary Judgment is **DENIED IN PART and GRANTED IN PART**.

New Orleans, Louisiana this 24th day of September, 2020.

_____

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[81] *Suire*, 907 So.2d at 51.
[82] *Id*.
[83] Fabco Equip., Inc. v. Kreilkamp Trucking, Inc., 2013 WI App 141, 352 Wis. 2d 106, 115, 841 N.W.2d 542, 547 (quoting Estate of Kriefall v. Sizzler USA Franchise, Inc., 2012 WI 70, 342 Wis.2d 29, ¶ 60, 816, N.W.2d 853).